UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| APPLIED BIOLOGICS LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CASE NO. 6:25-CV-00469** |
| | § | **JURY TRIAL DEMANDED** |
| | § | |
| ELIZABETH BREEDLOVE RN MSN | § | |
| FNP C PLLC d/b/a BREEDLOVE | § | |
| FAMILY PRACTICE and ELIZABETH | § | |
| BREEDLOVE | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| v. | § | |
| | § | |
| BIOWERX, LLC, PARADIGM | § | |
| MEDICAL SOLUTIONS, LLC, and | § | |
| RMBB HEALTH, LLC | § | |
| | § | |
| *Third-Party Defendants* | § | |

## DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS AND DEMAND FOR JURY TRIAL

COMES NOW Defendants Elizabeth Breedlove RN MSN, FNP C PLLC d/b/a Breedlove Family Practice ("Clinic") and Elizabeth Breedlove ("Elizabeth") (collectively "Defendants") and file their Original Answer to Plaintiff Applied Biologics, LLC ("Plaintiff's) First Amended Complaint and Original Counterclaims as follows:

### PARTIES

1.      Defendants lack knowledge and information to admit or deny the allegations in Paragraph 1 of the First Amended Complaint ("Complaint").

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS      PAGE 1**

2.      Defendants admit the allegations in Paragraph 2 of the Complaint.

3.      Defendants admit the allegations in Paragraph 3 of the Complaint.

4.      Defendants admit the allegations in Paragraph 4 of the Complaint.

## JURISDICTION & VENUE

5.      Defendants do not dispute the Court's subject matter jurisdiction although they deny that Plaintiff is entitled to recover any damages.

6.      Defendants do not dispute the Court's jurisdiction.

7.      Defendants do not dispute venue.

## GENERAL ALLEGATIONS

8.      Defendants lack knowledge and information to admit or deny the allegations in Paragraph 8 of the Complaint.

9.      Defendants admit the allegations in Paragraph 9 of the Complaint.

10.      Defendants admit the allegations in Paragraph 10 of the Complaint.

11.      Defendants deny the allegation in Paragraph 11 that the Contract was executed by Elizabeth Breedlove in her individual capacity.  Defendants deny that Plaintiff's Exhibit 1 contains all the terms of the Parties' agreement.  The remainder of the allegations in Paragraph 11 are admitted.

12.      Defendants admit the allegations in Paragraph 12 of the Complaint.

13.      Defendants admit the allegations in Paragraph 13 of the Complaint.

14.      Defendants admit that the Clinic was invoiced for the Product and that Plaintiff has attached a putative summary of invoices to its Complaint ("Invoices"). Defendants deny that the Invoices are true and correct and that this amount is owed to Plaintiff.

15.      Defendants deny the allegations in Paragraph 15 of the Complaint.

16.      Defendants admit that the Clinic paid the amount referenced in Paragraph 16 of the

Complaint.

17. Defendants admit that the amount in Paragraph 17 of the Complaint has not been paid; denied that this amount is owed.

18. Defendants admit the Product was used; deny that any amount is owed to Plaintiff.

19. Defendants lack knowledge and information to admit or deny the allegations in Paragraph 19 of the Complaint.

20. Defendants admit no response was made to any courtesy reminder; deny that any such reminder was received.

21. Defendants admit that the amount referenced in Paragraph 21 of the Complaint has not been paid; denied that this amount is owed.

22. Defendants deny the allegations in Paragraph 22 of the Complaint.

23. Defendants deny the allegations in Paragraph 23 of the Complaint.

## COUNT I

### Breach of Contract (Against Clinic and Breedlove)

24. No response is required to this Paragraph.

25. Defendants deny the allegations contained in Paragraph 24.

26. Defendants deny the allegations contained in Paragraph 25.

27. Defendants deny the allegations contained in Paragraph 26.

28. Defendants deny the allegations contained in Paragraph 27.

29. Defendants deny the allegations contained in Paragraph 28.

## COUNT II

### Account Stated (Against Clinic and Breedlove)

30.     No response is required to this Paragraph.

31.     Defendants deny the allegations contained in Paragraph 31.

32.     Defendants deny the allegations contained in Paragraph 32.

33.     Defendants deny the allegations contained in Paragraph 33.

34.     Defendants deny the allegations contained in Paragraph 34.

35.     Defendants deny the allegations contained in Paragraph 35.

## COUNT III

### Unjust Enrichment (Against Clinic and Breedlove)

36.     No response is required to this Paragraph.

37.     Defendants deny the allegations contained in Paragraph 37.

38.     Defendants deny the allegations contained in Paragraph 38.

39.     Defendants deny the allegations contained in Paragraph 39.

### PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to any of the relief requested in its Prayer for Relief.

### DEFENDANTS' AFFIRMATIVE DEFENSES AND DEFENSES

1.     Defendant denies that the Contract contains all essential terms.

2.     Plaintiff's claims are barred, in whole or in part, by proportionate responsibility, comparative negligence, contributory negligence, and election of remedies.

3.     Plaintiff's claims are barred, in whole or in part, by Plaintiff's conduct which constitutes waiver, ratification, consent, promissory and equitable estoppel, and quasi-estoppel.

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS    PAGE 4**

4.      Plaintiff's claims are barred, in whole or in part, by Plaintiff's conduct which constitutes accord and satisfaction.

5.      Plaintiff's claims are barred, in whole or in part, by Plaintiff's conduct which constitutes fraud, fraud in the inducement, or unjust enrichment.

6.      Plaintiff's claims are barred, in whole or in part, by payment, credit, or Plaintiff's conduct which constitutes release or offset.

7.      Plaintiff's claims are barred, in whole or in part, by payment, credit, or Plaintiff's oral modification of the Contract.

8.      Plaintiff's claims are barred, in whole or in part, by its own wrongful acts or omissions.

9.       Plaintiff's claims are barred, in whole or in part, by lack or failure of consideration.

10.     Plaintiff's claims are barred, in whole or in part, by illegality and unconscionability.

11.     Plaintiff's claims are barred, in whole or in part, by justification, consent, payment, release, and laches.

12.     Plaintiff's claims are barred, in whole or in part, by Plaintiff's frustration or prevention of Defendant's performance.

13.     Plaintiff's claims are barred due to the failure of implied conditions or covenants precedent; the product ordered could not be reimbursed as represented, and the fundamental basis of the bargain failed.

14.     Plaintiff's claims are barred, in whole or in part, by the failure of conditions precedent.

15.     Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS     PAGE 5**

damages.

16.     Plaintiff's claims are barred, in whole or in part, by Plaintiff's prior material breaches of contract.

17.     Defendants reserve the right to rely upon such other defenses and affirmative defenses as may become available or apparent during discovery proceedings in this case.

## DEFENDANTS' FIRST AMENDED COUNTERCLAIMS

1.     Defendants Elizabeth Breedlove RN MSN, FNP C PLLC d/b/a Breedlove Family Practice ("Clinic") and Elizabeth Breedlove ("Elizabeth") (collectively "Defendants") and file their Original Counterclaims against Plaintiff Applied Biologics, LLC ("Applied"), Third-Party Defendant BioWerkx, LLC ("Biowerx"),  Paradigm MedSolutions, LLC ("Paradigm"), and RMBB Health, LLC ("RMBB") as follows:

## THE PARTIES

2.     Plaintiff Applied Biologics, LLC ("Applied") has appeared in this lawsuit and can be served through its counsel of record.

3.     Third-Party Defendant BioWerX, LLC ("Biowerx") is Texas domestic limited liability company with its principal place of business at 1254 Bolton Court, Southlake Texas 76092. Biowerx may be served with process by serving its registered agent Trent Allison at 1254 Bolton Court, Southlake Texas 76092.

4.     Third-Party Defendant Paradigm MedSolutions, LLC ("Paradigm") is Texas domestic limited liability company with its principal place of business at 210 W. Wall Street Grapevine, Texas 76051. Paradigm may be served with process by serving its registered agent Ryan Howard at 210 W. Wall Street Grapevine, Texas 76051.

5.     Third-Party Defendant RMBB Health, LLC ("RMBB") is limited liability company incorporated in Delaware, who may be served by serving its registered agent The Corporation Trust

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS     PAGE 6**

Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. RMBB Health's Managing Partner, Eric Gruntfest, resides in Portland, Maine.

6.    A substantial part of the events giving rise to the causes of action as alleged herein occurred in the Eastern District of Texas and have a direct effect on Defendants in the Eastern District of Texas.

## JURISDICTION & VENUE

7.    The Court has original jurisdiction of this action pursuant to 28 U.S.C. §1332(a). This Court has supplemental jurisdiction over Defendants' state law counterclaims asserted herein, pursuant to 28 U.S.C. §1367. These claims derive from a common nucleus of operative facts and are so related that they form part of the same case or controversy.

8.    The Court has in personam jurisdiction over Applied because Applied has voluntarily subjected itself to such jurisdiction in this Court.

9.    The Court has in personam jurisdiction over Biowerx because Biowerx is a Texas limited liability company that has sufficient minimum contacts with Texas pursuant to TEX. CIV. PRAC. & REM. Code § 17.042,—*e.g.*, "doing business," including contracting and committing a tort in whole or in part in Texas, and Defendants' third-party claim arises from or relates to those contacts. Specifically, Biowerx's Texas-directed conduct as an agent of Applied, undertaken on behalf of Applied, constitutes purposeful availment of the Texas forum by Biowerx, and exercising jurisdiction over Biowerx comports with fair play and substantial justice.

10.    The Court has in personam jurisdiction over Paradigm because Paradigm is a is a Texas limited liability company that has sufficient minimum contacts with Texas pursuant to TEX. CIV. PRAC. & REM. Code § 17.042,—*e.g.*, "doing business," including contracting and committing a tort in whole or in part in Texas, and Defendants' third-party claim arises from or relates to those

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS    PAGE 7**

contacts. Specifically, Paradigm's Texas-directed conduct as an agent of Applied, undertaken on behalf of Applied, constitutes purposeful availment of the Texas forum by Paradigm, and exercising jurisdiction over Paradigm comports with fair play and substantial justice.

11.     The Court has in personam jurisdiction over RMBB because RMBB has sufficient minimum contacts with Texas pursuant to TEX. CIV. PRAC. & REM. Code § 17.042,—*e.g.*, "doing business," including contracting and committing a tort in whole or in part in Texas, and Defendants' third-party claim arises from or relates to those contacts. RMBB's Texas-directed conduct as an agent of Applied, undertaken on behalf of Applied, constitutes purposeful availment of the Texas forum by RMBB, and exercising jurisdiction over RMBB comports with fair play and substantial justice.  Specifically, RMBB performed Applied's contractual obligation to conduct insurance verifications of Defendants' patients who resided in Texas.  It appears that RMBB used the patient information provided by Defendants on Biowerx's Order Form and other patient information, including patient photographs received by Biowerx, to conduct insurance pre-authorizations.[1] RMBB further initiated conference calls with Defendants and other Third-Party Defendants in Texas to discuss RMBB's reimbursement services.[2]   RMBB fraudulently concealed from Defendants at all times the material fact that XWrap was not approved by Medicare for wounds larger than 32 cm$^2$.

12.     Biowerx, Paradigm, and RMBB are or may be liable to Defendants for all or part of  Applied's claim under Rule 14.

### FACTUAL BACKGROUND

13.     Applied is the head of a group of conspirators who fraudulently schemed to take advantage of Defendants to a grossly unfair degree, in order capture as much ill-gotten money as

---

[1] Exhibit 1, RMBB Reimbursement Support Program documents.
[2] Exhibit 2, June 3, 2024 Teams meeting invite from RMBB Health.

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS     PAGE 8**

possible before Medicare either denied or audited the paid claims (which Applied knew was a virtual certainty), leaving Defendants with stuck with the bill.

14.     Defendants are not the only victims of Applied's fraud; the Department of Justice has opened False Claims Act investigation to determine whether there has been a violation of 31 U.S.C. § 3729 in connection with Applied's submission of false claims to Medicare.[3] Exhibit 1.

15.     Breedlove Family Practice[4] (the "Clinic") is committed to delivering patient-centered care to individuals of all ages. The Clinic offers a wide range of services, from preventive care and routine check-ups to managing chronic conditions and providing acute care, including skin substitutes, after carefully applying evidence-based advanced wound therapies.

16.     Today, the Clinic treats chronic, non-healing wounds of all etiologies. The Clinic requires clear, thorough documentation of medical necessity before escalating care. Patients must demonstrate at least four weeks of documented traditional wound care that has failed to produce measurable improvement, along with serial wound measurements showing lack of progress. Advanced therapies are not initiated casually or preemptively; they are reserved for wounds that meet strict clinical criteria. Elizabeth Breedlove ("Elizabeth") is the manager of the Clinic and Marc Breedlove ("Breedlove") is the President and an authorized representative of the Clinic.

17.     In 2023, the Clinic was doing business with a skin substitute/allograft manufacturer Skye Biologics, out of California.  The Clinic was introduced to Applied in mid-to late February, 2024 when it was promoting its allograft, XWrap.  Paradigm, an authorized sales representative of Applied, recommended XWrap to the Clinic, and in late February, 2024, Ryan Howard, an authorized representative of Paradigm falsely represented to Breedlove on a telephone call that Applied had a higher Medicare reimbursement rate on XWrap than the Clinic could get by using

---

[3] Exhibit 3, Civil Investigative Demand, United States Department of Justice.
[4] Elizabeth Breedlove RN MSN, FNP C PLLC

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS     PAGE 9**

Skye Biologics' allograft.  Specifically, Howard falsely represented that the Clinic could get reimbursed more than 160% the amount of Skye Biologics, or $1,692 per cm$^2$ of XWrap, compared to $1000 per cm$^2$ of allograft sold by Skye Biologics.[2]

18.    Ryan Howard was at all relevant times acting in the course and scope of his employment by Paradigm.

19.    Paradigm at all relevant times was acting as Applied's authorized representative and in the course and scope of its actual and apparent authority for Applied, in furtherance of Applied's business.  Upon information and belief, Paradigm was expressly or impliedly authorized to (1) promote, market, or sell XWrap, (2) negotiate contracts for the purchase of XWrap; and (3) make representations about XWrap's value and features.  XWrap was not fit for purpose for which it was supplied and purchased.

20.    Furthermore, Applied intentionally created the appearance that Paradigm had authority to act on its behalf with respect to (1) promoting, marketing, or selling XWrap, (2) negotiating contracts for the purchase of XWrap, and (3) making representations about XWrap's value and features.  Defendants reasonably relied on that appearance to their detriment.  Applied accepted the benefits of Paradigm's transactions with Defendants as its agent and is vicariously liable for the actions of Paradigm alleged herein.

21.     Applied needed to instill confidence in the Clinic that the Clinic would be paid by Medicare for the products that would be ordered, which was a material element of the transaction and induced the Clinic to sign the Contract with Applied. [Doc. 11-1.]

22.    The Contract requires Applied to conduct insurance verification procedures and conduct eligibility determinations and prior authorizations.  Defendants were under the impression that Applied employed Biowerx to conduct the insurance verification services provided for in the

Contract, since Defendant used Biowerx' Order Form and sent Biowerx all patient information.[5]

23.     The Clinic treated two patients whose wounds were smaller than 32 cm$^2$ with XWrap, and there were no issues with Medicare reimbursement.  As acknowledged by Plaintiff, The Clinic paid Applied's invoices for these patients.

24.     Clinic patient three ["Patient 3"] had a wound of approximately 300 cm$^2$. After Biowerx received Patient 3's wound photos for the insurance verification process, on or about April 17, 2024, Blake Trimble, an authorized representative of Biowerx, specifically instructed Breedlove on a telephone call that the Clinic had to bill for XWrap 32 cm$^2$ at a time, on multiple claim forms, for wounds larger than 32 cm$^2$ and falsely represented that a 300 cm$^2$ allograft would be reimbursed through Medicare if it were billed in this manner.  The Clinic followed the billing instructions provided and justifiably relied on this misrepresentation to its detriment.

25.     Blake Trimble and Jessica Cornejo were at all relevant times acting in the course and scope of their employment by Biowerx.

26.     Biowerx was at all relevant times acting as Applied's authorized representative and in the course and scope of its actual and apparent authority for Applied, in furtherance of Applied's business.  Upon information and belief, Biowerx was expressly or impliedly authorized to (1) promote, market, or sell XWrap, (2) negotiate contracts for the purchase of XWrap; and (3) make representations about XWrap's value and features.  According to its website:

> Biowerx is a management service organization providing various administrative and management functions for Applied Biologics. We provide compliance training, product education, employee background checks, customer service, and more to assist Applied Biologics in their customer service needs. BioWerX

27.     Furthermore, Applied intentionally created the appearance that Biowerx had authority to act on its behalf with respect to (1) promoting, marketing, or selling XWrap, (2)

---

[5] Exhibit 4, Biowerx Order Form.

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS    PAGE 11**

negotiating contracts for the purchase of XWrap, and (3) making representations about XWrap's value and features.  Defendants reasonably relied on that appearance to their detriment.  Applied accepted the benefits of Biowerx's transactions with Defendants as its agent and is vicariously liable for the actions of Biowerx alleged herein.

28.     Defendants have been informed that it was not Biowerx who conduct the insurance verifications provided for in the Contract, but another third-party company, RMBB.  See [Doc. 20, Paradigm's Answer]: "Paradigm denies the allegations in Paragraph 20 of the Counterclaims. Further answering, Paradigm affirmatively states that RMBB Health performed the insurance verification services, not Biowerx."

29.     It appears that RMBB used the patient information provided by Defendants on Biowerx' Order Form and other patient information received by Biowerx, including patient photographs, to conduct insurance verifications and pre-authorizations.[6]

30.     RMBB was at all relevant times acting as Applied's authorized representative and in the course and scope of its actual and apparent authority for Applied, in furtherance of Applied's business.  Upon information and belief, RMBB was expressly or impliedly authorized to (1) promote, market, or sell XWrap, and (2) make representations about XWrap's value and features.

31.     Furthermore, Applied intentionally created the appearance that RMBB had authority to act on its behalf with respect to (1) promoting, marketing, or selling XWrap, and (2) making representations about XWrap's value and features.  Defendants reasonably relied on that appearance to their detriment.  Applied accepted the benefits of RMBB's transactions with Defendants as its agent and is vicariously liable for the actions of RMBB alleged herein.

32.     As the Clinic now knows, XWrap had a ceiling on the number of square

---

[6] See Exhibit 1.

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS    PAGE 12**

centimeters that Medicare would cover due to what is called a "Medically Unlikely Edit" ("MUE"); that limit is 32 cm$^2$. The Clinic was never going to get fully reimbursed on claims over that limit.

33.    If a manufacturer's MUE limit is exceeded by the practitioner, the practitioner will not be reimbursed for any amount over the size limit, and even if a claim makes it through and is paid, it will most likely be subject of a recoupment audit.

34.    Neither Applied or its agents Paradigm, Biowerx, or RMBB disclosed the material fact of XWrap's MUE, or corrected their misleading and fraudulent representations that (1) the Clinic would be reimbursed by Medicare for XWrap at $1,692 per cm$^2$, before signing the Contract or (2) the Clinic would be fully reimbursed by Medicare if it followed Biowerx's instructions to bill for XWrap 32 cm$^2$ at a time.  The Clinic was not aware of XWrap's limitations at the time of the Contract or when it ordered XWrap to treat Patient 3.

35.    Upon information and belief, the reason for the MUE designation is to warn manufacturers that they will not be reimbursed by Medicare.  The Clinic was instructed to divide each XWrap claim into multiple claim forms in order to attempt to pass it through the Medicare billing system, despite Applied's knowledge of the MUE warning.

36.    Applied was aware that Patient 3's wounds were nearly ten times in excess of XWrap's MUE.  Before Patient 3's case was even sent in for Medicare pre-authorization by RMBB, Applied should have told the Clinic that XWrap would not work on that wound. Instead, Applied directed the Clinic to submit claims anyway, knowing that they would be denied or recouped after an audit.  The Clinic submitted these claims in reliance on Applied's and its agents' fraud; had it known of the XWrap's MUE, it never would have signed the Contract or ordered XWrap from Applied.  Nor would the Clinic have exposed its clients, many of whom were in hospice care, to thousands of dollars in Medicare co-pays for what were, in essence, "Gucci bandaids" that were

unreimbursed.

37.    The Clinic followed Medicare guidelines on charting skin substitute patients and submitting their claims.  The Clinic also took pictures that were put into the patient's chart.  On the June 2024 Teams call with RMBB and Biowerx referenced *supra*, RMBB confirmed that the Medicare claim submissions were correct on Clinic's part.

38.    In reality, it was Applied who failed to follow Medicare guidelines.  The fact that Medicare only approved 32 cm² of XWrap graphs to be laid on a patient means that Applied can't lay more than that size of a wound. Applied knew that XWrap was not going to work on a wound if it exceeded 32 cm², and may have caused the filing of false or fraudulent claims by instructing the Clinic to bill for XWrap on wounder exceeding Applied's MUE.

39.    And since Applied, through its agent RMBB, was doing the insurance verification on the wound, they both would have known well in advance of ever laying a graft that it would not work.

40.    Where one party has superior, specialized knowledge and the other is operating under a mistake that the knowledgeable party recognizes, silence is not neutral; it is an affirmative use of that informational advantage to extract a benefit the seller could not fairly obtain in an honest negotiation.  Particularly in the medical-product context, the seller typically has access to clinical data and regulatory communications that no reasonable buyer could replicate through ordinary diligence. When the seller can see that the buyer is mistaken belief (for example, that the product is more effective or approved for a particular use when it is not) is precisely what is driving the purchase, choosing not to correct that mistake is indistinguishable in substance from affirmatively confirming it. The law of fraud and misrepresentation has long recognized that exploiting such a known, material mistake—rather than correcting it—constitutes taking unfair advantage, not

arm's-length bargaining.

41.     It was Paradigm's intent, as an authorized representative and agent of Applied, that its misrepresentation be acted upon by Clinic by signing the Contract to order XWrap.   It was Biowerx' and RMBB's intent, as authorized representatives and agents of Applied, that their misrepresentations be acted upon by Clinic by continuing to order larger quantities of XWrap. Applied intended to misrepresent and misinform the Clinic about XWrap's qualities and value, then take advantage of the Clinic's prior inexperience with XWrap to take as much money as possible from the Clinic before Medicare either denied the claims or audited the paid claims, which was an eventual certainty, given XWrap's MUE.

42.     Defendants justifiably relied on Paradigm, RMBB, Biowerx, and Applied, through its authorized representatives and agents Paradigm, RMBB, and Biowerx, not to withhold material facts and mislead Defendants about the value and limitations of XWrap.  Had Defendants been told the truth about XWrap's MUE, the Clinic never would have signed the Contract and never would have ordered XWrap from Applied. The Clinic could have ordered allografts from a different manufacturer with a higher or no MUE, which Medicare would reimburse (and has) for larger necessary grafts.

43.     The vast majority of claims submitted for Patient 3 were denied.  The Clinic sent every denial letter to Biowerx, as Applied's agent, since, it reasonably believed that Biowerx was conducting the insurance verification services provided for in the Contract.  Breedlove further reported to Biowerx, including specifically to Jessica Cornejo numerous times, that the Clinic was not being reimbursed, and until that issue was figured out, no more XWrap invoices were being paid.

44.     After Defendants realized they were never going to get reimbursed on Patient 3's

claims, the Clinic decided to work with another allograft distributor.

45.    Applied has commenced nearly 20 actions against its former customers to collect on years-old unpaid XWrap invoices, perhaps in attempt to make their invoices appear genuine, for purposes of the E.D. of Kentucky False Claims Act investigation.  None of these cases have been tried to their merits; however, a number of Defendant clinics already have filed counterclaims that allege a strikingly similar pattern of behavior:

- Applied fraudulently induced Defendant into ordering XWrap by representing that XWrap was covered by Medicare, and that Applied would cover the cost of the XWrap if Medicare denied the claims. *Applied Biologics, v. Tru-Care, Health Clinic*, Case No. 4:25-cv-1365, in the U.S.D.C. for the Eastern District of Texas, Sherman Division [Doc. No.21, ¶178-199, Defendants' Original Counterclaim].

- Applied fraudulently induced Defendant into ordering XWrap by  representing that XWrap was covered by Medicare, and that Applied would cover the cost of the XWrap if Medicare denied the claims.  *Applied Biologics, v. Chain Connect, LLC, et al*, Case No. 4:25-cv-01386-BJ, in the U.S.D.C. for the Northern District of Texas, Fort Worth Division [Doc. No.18, ¶49-55, Defendants' Original Counterclaim].

- Applied breached the Parties' contract by agreed to provide Medicare-compliant products which would not incur denials or claw backs assured that payment would only be sought upon insurance approval.  Applied, through its agents also fraudulently induced Plaintiff into buying XWrap by explicitly stating that it would not pursue payment  if insurance was not approved. *Applied Biologics, v. Optimum Wound Care, et al*, Civil Action No. 3:25-cv-00738-RGJ-CHL, in the U.S.D.C for the Western District of Kentucky, [Doc. No. 22 ¶45-55, Defendants' Amended Counterclaim].

- Applied, through its agents, represented that XWrap was covered by Medicare, but XWrap was an experimental and investigational product that was not covered.  Reimbursement by Medicare was an essential term of Plaintiff's contract with Applied for the purchase of XWrap. *Applied Biologics, v. Skin Unlimited, et al*,  Case No. 5:25-cv-1371, in the U.S.D.C. for the Western District of Texas, San Antonio Division [Doc. No.25, ¶30-36, Defendants' Original Counterclaim].

46.    It is clear that Defendants' experience in this case was not isolated.  It is improbable, if not impossible, that Defendants were mistaken about or misunderstood Plaintiffs' representation that XWrap was covered by Medicare, and that reimbursement by Medicare was a

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS    PAGE 16**

material term of the agreement with Applied, given that the same representations were made to number of other clinics. Making false promises that XWrap was covered by Medicare and that Applied would not hold the Clinic liable for any unreimbursed payment was obviously Applied's modus operandi.

47. On November 21, 2024, Biowerx invited Breedlove to a Teams Meeting with Applied to try to get the Clinic's business back ("Meeting"). Edward Britt, Applied's President, was in the Meeting, along with several representatives of Biowerx.[7]

48. Applied initiated the Meeting because it knew Breedlove had a large practice, and Applied was trying to pitch him on bringing his business back to Applied. Breedlove unequivocally stated in the Meeting that the reason the Clinic had not paid any invoices on Patient 3 was because the Clinic had not been reimbursed by Medicare. Applied verbally confirmed its understanding of the Clinic's position that no payment was due to Applied until the Clinic was reimbursed by Medicare, and Applied agreed that it was not expecting to get paid unless and until the Clinic was reimbursed. *Declaration of Thomas King*, attached hereto as Exhibit 6. There was no suggestion in the Meeting that Applied was going to sue the Clinic on those invoices; Applied was still trying to court the Clinic's business.[8]

49. The Clinic has paid Applied on all reimbursed claims, and Applied accepted this amount in satisfaction of the Contract, as confirmed by a disinterested witness who was present at the Meeting. Applied has waived or is estopped from claiming any further payments.

50. Thus, Applied's "stated account," by its own admission, is "not true and just," nor "due and owing." Furthermore, due to Applied's prior material breach of the Contract, it cannot demand any further performance by Defendants. For the same reasons, there is no unjust

---

[7] Exhibit 5, November 11, 2024 Teams Meeting Notice.
[8] Exhibit 6, Declaration of Thomas King.

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS   PAGE 17**

enrichment on the part of Defendants.

51.    Had the Clinic not been misled by Applied, Paradigm, and Biowerx, been told the whole truth about XWrap's limitations, or had Applied simply refused to offer products beyond its MUE, the Clinic never would have signed the Contract and never would have ordered XWrap from Applied.

52.    Defendants are not only out the money they would have earned from the use of Plaintiffs' product as promised, but they are also being sued for the product Medicare would never have reimbursed.  In addition, due to Plaintiff's fraud, Defendants lost the opportunity to work with honest manufacturers to treat patients with suitable allografts.  Furthermore, as a direct and natural consequence of Applied's breach of the Contract, the Defendants suffered lost profits. Both parties contemplated and understood that the Clinic would earn profits from its wound care practice and its treatment of patients with suitable allografts, and that Applied's failure to perform would foreseeably result in lost profits to the Clinic.

## COUNT I
### FRAUD AND FRAUDULENT INDUCEMENT-against Applied, Paradigm, Biowerx, and RMBB

53.    Defendants incorporate by reference each and every fact and allegation set forth above.

54.    In late February 2024, Paradigm, an authorized sales representative of Applied, promoted XWrap to the Clinic, and Ryan Howard, an authorized representative of Paradigm, falsely represented to Breedlove that Applied's Medicare reimbursement rate on XWrap or $1,692 per $cm^2$ of XWrap, more than 160% the amount of Skye Biologics, the Clinic's current allograft provider.

55.     Applied, and its agents Paradigm and Biowerx, were aware that Medicare

reimbursement was a material element of the transaction, and Applied needed to instill confidence in the Clinic that the Clinic would be paid by Medicare for the products that would be ordered; Applied, and its agents Paradigm and Biowerx, intended that Defendants act upon the representation that the Clinic would be fully reimbursed for XWrap to sign the Contract and order Applied's products. Applied, and its agents Paradigm and Biowerx, never had any intent to perform, and Defendants justifiably relied on Paradigm's representation of Applied's Medicare reimbursement rates in signing the Contract.

56.    When Biowerx, an authorized sales representative of Applied, evaluated Clinic Patient 3, who had a wound of approximately 300 $cm^2$, on or about April 17, 2024 for the insurance verification process, Blake Trimble, an authorized representative of Biowerx, specifically instructed Breedlove on a telephone call how to bill Medicare for Patient 3. Biowerx directed the Clinic to bill for XWrap 32 $cm^2$ at a time, on multiple claim forms, for wounds larger than 32 $cm^2$ and falsely represented that a 300 $cm^2$ allograft would be reimbursed through Medicare if it were billed in this manner. Furthermore, RMBB, an authorized representative of Applied, conducted the insurance pre-authorization for Patient 3.

57.    Defendants justifiably relied on Biowerx's representations that XWrap would be fully reimbursed by Medicare if the Clinic followed its billing instructions in submitting orders for XWrap to treat Patient 3.

58.    Because Applied and its agents concealed that XWrap had a Medically Unlikely Edit" ("MUE") limit on the number of square centimeters that Medicare would cover of 32 $cm^2$, the vast majority of claims submitted for Patient 3 were denied.

59.    Neither Applied nor its agents Paradigm, Biowerx, or RMBB disclosed the material fact of XWrap's MUE, or corrected their misleading and fraudulent representations that

(1) the Clinic would be reimbursed by Medicare for XWrap at $1,692 per cm$^2$, before signing the Contract; (2) the Clinic would be fully reimbursed by Medicare on wounds larger than 32 cm$^2$ if it followed Applied's instructions to bill for XWrap 32 cm$^2$ at a time on multiple claim forms; and (3) Applied had no expectation of payment on any invoices unless and until the Clinic was reimbursed by Medicare.

60.    Applied, Paradigm, and Biowerx concealed XWrap's limitations, and Defendants were not aware of them at the time of the Contract or when it ordered XWrap to treat Patient 3. Applied, Paradigm, and Biowerx intended for Defendants to rely on Paradigm's and Biowerx's false representations about XWrap's Medicare reimbursement and the withheld material information about XWrap's MUE in order to induce the Clinic to sign the Contract and continue to order Applied's products. Specifically, RMBB, an authorized representative of Applied, conducted the insurance pre-authorization for Patient 3, and should have disclosed that the wound was beyond XWrap's MUE.

61.    Defendants justifiably relied on Paradigm, RMBB, Biowerx, and Applied, through its authorized representatives and agents Paradigm, RMBB, and Biowerx, not to withhold material facts and mislead Defendants about the value and limitations of XWrap.  Had Defendants been told the truth about XWrap's MUE, the Clinic never would have signed the Contract and never would have ordered XWrap from Applied. The Clinic could have ordered allografts from a different manufacturer with a higher or no MUE, which Medicare would reimburse (and has) for larger necessary grafts.

62.    Defendants have been damaged as a result of Applied's, Paradigm's, RMBB's and Biowerx's fraud and fraudulent inducement and are entitled to damages in an amount to be determined by a jury, pre- and post-judgment interest, costs, and attorney's fees. Furthermore,

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS    PAGE 20**

Defendants justifiably relied on Applied's misrepresentation that it would not seek further payment from Defendants until the Clinic was fully reimbursed by Medicare by forbearing from taking any action on the invoices that are the subject of Applied's claim and have been damaged by having to defend themselves in this lawsuit.

63.    Alternatively, Defendants are entitled to equitable rescission of the Contract.

## COUNT II
## NEGLIGENT MISREPRESENTATION-against Applied, Paradigm, and Biowerx

64.    Defendants incorporate by reference each and every fact and allegation set forth above.

65.    Applied, Paradigm, and Biowerx, in the course of their business, employment, and in a transaction in which they have a pecuniary interest, specifically, the Contract, supplied false information for the guidance of Defendants in their business.  This false information includes that (1) the Clinic would be reimbursed by Medicare for XWrap at $1,692 per $cm^2$ ; (2) the Clinic would be fully reimbursed by Medicare on wounds larger 32 $cm^2$ if it followed Applied's instructions to bill for XWrap 32 $cm^2$ at a time on multiple claim forms; and (3) Applied had no expectation of payment of any invoices unless and until the Clinic was reimbursed by Medicare.  These false representations were made for the guidance of Breedlove, to entice the Clinic to order XWrap and who Applied wanted to continue doing business with in November 2024, and Applied, and its agents Paradigm and Biowerx never had any intention of performing.

66.    Applied, Paradigm, and Biowerx failed to exercise reasonable care or competence in obtaining or communicating the information, and Defendants justifiably relied on it.

67.    Defendants have suffered pecuniary loss as a result of Applied's, Paradigm's, and Biowerx's negligent misrepresentations and are entitled to damages in an amount to be determined by a jury, pre- and post-judgment interest, costs, and attorney's fees.

**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS    PAGE 21**

## COUNT III
## BREACH OF A.R.S. § 47-2315. IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE -against Applied

68.    Defendants incorporate by reference each and every fact and allegation set forth above.

69.    Applied is a merchant with respect to goods of the kind at issue, *i.e.*, XWrap, and Applied and Defendants had Contract for the sale of those goods. Defendants have satisfied all conditions precedent to recovery under the Contract.

70.    Applied knew, or had reason to know at the time of contracting, that Defendants would be treating patients with wounds larger than XWrap's MUE of 32 cm$^2$ and that Medicare reimbursement was a material part of the parties' agreement.

71.    Defendants relied on Applied's judgment to provide a suitable produce Defendants' particular purpose, and Defendants' reliance was reasonable under the circumstances.

72.    The goods Applied provided were not fit for the particular purpose for which they were purchased, so the implied warranty was materially breached.

73.    Defendants suffered damages caused by the goods' unfitness, and Defendants are entitled to damages in an amount to be determined by a jury, pre- and post-judgment interest, costs, and attorney's fees.

## COUNT IV
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING-against Applied

74.    Defendants incorporate by reference each and every fact and allegation set forth above.

75.    The Contract between Applied and Defendants includes an implied covenant of good faith and fair dealing.

76.    Applied's conduct as described herein was inconsistent with Defendants' reasonable expectations under the Contract and with the Contract's fundamental basis because the product ordered could not be reimbursed as represented.

77.    Applied was dishonest, opportunistic, and unfair in a way that deprived Defendants of the benefits Defendants reasonably expected to receive.  Applied knew there would never be any Medicare coverage for XWrap treatment over its MUE limit.  This was all a scam designed to enrich Applied and its co-conspirators at Defendants' expense.

78.    Defendants are entitled to damages in an amount to be determined by a jury, pre- and post-judgment interest, costs, and attorney's fees.

**COUNT V**
**CIVIL CONSPIRACY TO COMMIT FRAUD -against Applied, Paradigm, Biowerx, and RMBB**

79.    Defendants incorporate by reference each and every fact and allegation set forth above.

80.    Paradigm, Biowerx, RMBB and Applied agreed to achieve an unlawful purpose and then participated in, or caused, the commission of the fraud and negligent misrepresentation alleged herein.

81.    Defendants have been damaged as a result of Applied's, Paradigm's, and Biowerx's conspiracy and are entitled to damages in an amount to be determined by a jury, pre- and post-judgment interest, costs, and attorney's fees. Alternatively, Defendants are entitled to equitable rescission of the Contract.

82.    Had Defendants been told the truth, or had Applied simply refused to offer products beyond its MUE, Defendants would never have contracted to order XWrap from Applied.

83.    Applied's conduct as described herein was outrageous and committed with reckless

indifference to the rights of others, and punitive damages should be assessed to deter Applied and other companies like it from similar conduct in the future.

## DEFENDANTS' DEMAND FOR JURY

84.     Defendants demand a jury trial on all issues so triable and have paid the jury fee.

**WHEREFORE, PREMISES CONSIDERED,** Defendants respectfully requests that Plaintiff Applied Biologics, LLC ("Applied"), Third-Party Defendant BioWerkx, LLC ("Biowerx"), Paradigm MedSolutions, LLC ("Paradigm"), and RMBB Health, LLC ("RMBB") be cited to appear and answer, and that upon a final hearing of the cause, judgment be entered for Defendants and against Plaintiffs and Third-Party Defendants as follows:

a.     An order that Plaintiff take nothing on its claims;

b.     All damages suffered by Defendants in all forms, including direct damages, reliance damages, special damages, consequential damages, attorneys' fees as damages, and lost profits;

c.     In the alternative, equitable rescission of the Contract;

d.     Punitive damages;

e.     All pre-judgment and post-judgment interest as allowed by law;

f.     Attorney's fees, costs, and expenses as allowed by law; and

g.     Such other and further relief, at law or in equity, to which Defendants may show themselves to be justly entitled.

**Dated: May 26, 2026**

Respectfully submitted,

*/s/ Blake L. Beckham*
Blake L. Beckham
Texas Bar No. 02016500
blake@bptriallaw.com
Sarita A. Smithee
Texas Bar No. 24054254.
sarita@bptriallaw.com
BECKHAM PORTELA

3400 Carlisle, Suite 550
Dallas, Texas 75204
214-965-9300 Telephone
214-965-9301 Facsimile

**ATTORNEYS FOR
ELIZABETH BREEDLOVE RN MSN
FNP C PLLC d/b/a BREEDLOVE
FAMILY PRACTICE AND
ELIZABETH BREEDLOVE**


## CERTIFICATE OF SERVICE

The undersigned Counsel hereby certifies that the foregoing has been served via ECF and as indicated below on May 26, 2026.


J. Brian Vanderwoude                                    Via ECF: vanderwoude.brian@dorsey.com
**DORSEY & WHITNEY LLP**
200 Crescent Court, Suite 1600
Dallas, TX 75201
214 981-9900 (main)
214 981-9901 (facsimile)


Madison A. Burr                                         Via ECF: burr.madison@dorsey.com
Michael Galen                                          Via ECF: galen.micahel@dorsey.com
**DORSEY & WHITNEY LLP**
2325 E. Camelback Road, Suite 900
Phoenix, AZ 85016
602-735-2700 (main)
602-926-2471 (facsimile)


**ATTORNEYS FOR PLAINTIFF APPLIED
BIOLOGICS, LLC**

Adam P. Schwartz (*Admitted Pro Hac Vice*).
aschwartz@carltonfields.com
Erin J. Hoyle (*Admitted Pro Hac Vice*)
ehoyle@carltonfields.com
Carlton Fields, P.A.
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, FL 33607
Telephone: 813.223.7000


**DEFENDANTS' ORIGINAL ANSWER AND FIRST AMENDED COUNTERCLAIMS    PAGE 25**

Fax: 813.229.4133

and

Frank C. Brame
Texas Bar No. 24031874
The Brame Law Firm PLLC
frank@bramelawfirm.com
4131 N. Central Expy Suite 900
Dallas, Texas 75204
214.643.6073 (office)
713.857.8925

**ATTORNEY FOR THIRD-PARTY DEFENDANT
BIOWERX, LLC**

Joseph D. Austin
State Bar No. 24101470
joseph.austin@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
(817) 332-2500 (telephone)
(817) 878-9280 (facsimile)

**ATTORNEY FOR THIRD-PARTY DEFENDANT
PARADIGM MEDICAL SOLUTIONS, LLC**

*/s/ Blake L. Beckham*
Blake L. Beckham